a balance. Mr Ken Karamath for the balance. Mr Hill for the appellate. Good morning, Council. Mr Ken Karamath. Please proceed when you're ready. Good morning and may it please the court. I'm Nandan Ken Karamath. I represent Cynthia Ballenger and Christopher Price. They're a married couple. I may refer to them as the Price's. I've reserved 2 minutes for a brief introduction. Rebuttal. The Price's probably argued that their entry in less than 1 minute walk south of the hallway followed by 5 and a half minutes of standing in line to exit was in complete compliance with the police cordon that was right there at the door. As they entered, there was a police line to the left. They walked to the right for a minute. They encountered Officer Atax and there may have been another officer there. They never went that point. In fact, no one who entered in the video in that arena went past Officer Atax. That was another side of the cordon. So they walked through an open door and like any public building, it doesn't mean you're going to go any further. You'd be subject to whatever the police tell you and they were in complete compliance with whatever the police told them. We're going to highlight fundamental differences in statutory interpretation of restricted area, disruptive conduct, and the count to provision that there be impact causation from disruptive conduct that leads to the delay of the proceeding in this case until 8 p.m. Mr. King-Kiramath, can I ask you a particular question that I'm interested in? I'm particularly interested in your argument that there was insufficient evidence to support mens rea for counts two and three, more specifically whether the evidence shows that the prices had an intent to disrupt official proceedings. Now, of course, it's very difficult to make out an insufficiency of the evidence argument. And so I'm just wondering, what is your strongest argument that there was insufficient evidence to support mens rea for counts two and three specifically? So we think that the mens rea describes must be associated with the physical conduct of the prices. So you can assemble a lot of statements, right? But what is the physical conduct of the prices? So let's talk about the five minutes standing in line to exit. What is the mens rea of standing in line to exit? It is to stand in line to exit. So the only mens rea issue we have here is really the one minute walk and then the police officer asks them to go no further and they do. So part of our point is all of this long conversation and all of these other issues, which are somewhat tangential, can't describe to the actual physical conduct and the mens rea scope shouldn't be broader than the physical conduct. So in other words, first of all, you have to have the physical conduct and we're arguing that didn't occur and that there wasn't a restricted area. Beyond that, with respect to the intent requirement, we think you have to, again, think of the common sense situation here. They observed a door, they went into a door, all of the heightened mens rea requirements intent to disrupt all of these other things. There wasn't a lot of facts provided on that, but it all has to rest on the physical conduct of entering for a minute in front of a large number of police officers. So you're talking about the intent to disrupt the proceeding. That's the mens rea question. Correct. The key mens rea questions that we're challenging are on counts two through four, your honor. Disruptive conduct and demonstrative conduct. Was it not the intent of the entire gathering to disrupt the proceeding? Um, you know, we we believe that the charges are against individuals and the question is, what is the individual right? So those individuals who are part of the gathering? Well, this was an argument made by the district court as a different element even on the issue of physical conduct, which is that they quote unquote joined the mob. Now, that argument is not opposed or not discussed in the government's brief at this time. We think that is a fundamental point that the district court has this sort of joining construct. We think that joining construct is not legal because the charging documents talk about individual conduct. They could have charged aiding, abetting, conspiring. They could have charged a group that is permissible under 51040, but they did not. So the relationship to the group issue, first of all, we don't think there's any evidence of it. Uh, they don't know any of these people. So the the conduct at issue is, is their disruptive conduct for the individuals, not their relationship to a group. So we would argue that and as a point of legal interpretation, we think that's different. Also, we would point out that none of that relationship issue was raised in the charging documents. And so we had no opportunity that the notion of joining a mob was never raised during the trial until closing arguments. So I had no opportunity for discovery. I had no opportunities to talk about the issues. We supplied a joint statement of elements, never discussed this, this term, this concept of joining. Um, with respect to how should we understand, um, the district court's credibility determinations here? Because, um, the district court did make some determinations that, that Ms. Ballinger, Ms. Price was, um, not credible in describing her motives for participating in the events of January 6th. How should we, how should we view that? I mean, you know, because we, you know, the standard of review here is very, very stringent. Yes. So we agree with that, your honor. We disagree with the assessment, but we're not really asserting that here. We think we're just asserting that the government has the obligation to show what the, what the mens rea is. And so even if you don't agree with anything, uh, Ms. Ballinger said, it probably wouldn't be relevant. All of this is on camera. Certainly the physical conduct is all on camera. Um, again, with respect to restricted area, we think the minimum definition of a restricted area is that boundaries reflecting government designations must beyond a reasonable doubt be materially present and identifiable for general observation at the time. Now that is not the government's position. The government holds that, uh, if, uh, restrictive boundaries were established in the morning, whether they are existent later at the time of the prices walk, uh, is not material. Uh, we, we disagree with that legal interpretation. We think the fundamental reason for the restricted area is notice. It's not authority. It's notice to the public of what is an ascertainable standard of guilt. We think that's the common reading. So the district court found that there were bike racks that had signs on them that had been pushed down, but that your clients noticed that when they walked past. So the district court, I don't believe made that particular finding your honor, but, uh, we showed in the brief that there were three bike racks across an area and that those three guy bike racks got pushed to the side before my clients got there, there was one separate bike rack in the middle, sort of a Vati just on its own standing and it wasn't blocking anything. It was off to the side. So this falls under a sort of separate issue of the district court's analysis, which is sort of a series of observations could substitute. So there was a single bike rack. It was not connected to anything. There were many people, police and everybody else sort of passing it by. So we don't think that constitutes identification of your view is that on January 6th, notwithstanding everything that was going on at the Capitol building, the science, the sirens are blaring that tear gas is flowing. There's commotion that it was not sufficiently clear that you're not supposed to go into the Capitol building. Well, you're speaking to a mens rea question. First of all, we're starting with the is there a restricted area, which is completely separate from men's right? And we're stating that the way to define restricted area is materially present at the time for observation. Now there are other tools that the police have for dispersal orders, all kinds of things. And we're just referring to our client situation here. So for example, at the Senate wing door, we have a very specific situation with the police cordon there. We're not, we have no idea what happens in the rest of the Capitol, and we're not really speaking to that. But in that very specific situation, we do have an actual material police cordon, and we're consistent with the general definition of police cordons at the time, or you know, in America, which is you can walk in front of police, and that's all they did. So they entered an open door and walked in front of police and then left. That's their entire crime. I would like to turn to the disruptive conduct finding, and what I want to do is articulate the distinction between the D.C. Circuit case of United States v. Alford and the district court's opinion. So the district court's opinion was very specific. They said this would not have been disruptive conduct except for the prices joined the mob. We've already argued that that is incorrect as a matter of law. We've argued it in the brief. It's a legal argument. The case of Alford doesn't necessarily make that argument, but I think an important distinction between Alford in this case is Alford did not on appeal argue that there wasn't a restricted area where he walked or that he didn't have knowledge of a restricted area, and we're arguing that specifically on the facts, and the key holding in it, Alford, is that things should be context specific, a agree with, and we just simply state the context of this case is very different, and you have to look at our specific facts to determine whether there's disruptive conduct and that there really isn't a join the mob construct available to the court. I want to make sure you get your rebuttal time too, but let me see if my colleagues have additional questions for you at this time. We'll make sure that you get the two minutes of rebuttal time that you asked for. Thank you. We'll go to government now. Mr. Hill. May it please the court, Dietrich Hill on behalf of the United States. I do want to start with what I think is an important distinction here, which is whether there was in fact a restricted area versus the knowledge element of the 1752 offenses, whether the defendants knew that there was a restricted area. With respect to the first, there's not a real dispute here that the day on January 6th, the government restricted this entire perimeter with barriers with fencing with area closed signs and with police officers stationed around this perimeter. So with respect to whether the area was in fact restricted later, the defendants have to be relying on the idea that when rioters moved aside, these barriers forced the police officers to retreat tore down many of the area closed signs that had a legal effect that legally de-restricted the area. That's not a sensible way to read a statute about the lawful authority of lawful law enforcement agencies restricting an area. Mr. Hill, if I can ask you, I mean, do you think for counts two and three, does the government agree that there is a separate element to demonstrate intent to disrupt an official proceeding? Yes, we think there has to be. Well, at the very least, knowledge that your conduct is going to be disrupted. I mean, both statutory provisions use the term intent to disrupt an official proceeding. So that seems to be an element of the crime. Yes. And so, of course, while it's a high bar to demonstrate that the evidence was insufficient to support the conviction, it's not impossible. We have a number of cases in the D.C. Circuit finding evidence insufficient. So I guess I'm just wondering, I mean, it seems that the district court pieced together a lot of evidence, some of it from before, days before January 6th. And some of the idea that there was an intent to disrupt an official proceeding may be characterized as mere speculation. So I'm wondering how the government would respond to that. Well, I certainly would agree that there were a lot of different pieces of evidence of intent here. And of course, as your honor referred to on a sufficiency challenge, we're entitled to the most favorable inference that can be drawn from any of those pieces of evidence. It's the most favorable inference, but it still can't be speculation. There still has to be a demonstrate. The government still has to demonstrate there was intent to disrupt an official proceeding. And here the prices walked in when there was no official proceeding going on. They stayed for a few minutes and walked out when directed by an officer. Right. Well, I would start with what I think is an undisputed fact that the prices understood that there was a certification going on on the day. Right. So I don't. Okay. You know, even assuming that's true, they knew there was a certification. They knew there was an official proceeding. You know, government has probably shown that they knew they were entering a restricted area of the Capitol building. But where's the intent to disrupt an official proceeding for these defendants in particular? Right. Well, if there's an official proceeding going on at the Capitol on the day, the certification of the election and you go into the Capitol, understanding that that's a area, understanding being able to see that you're augmenting a mob, which is occupying the Capitol. You have to know that that mob is preventing Congress from resuming its proceeding. In other words, you have to know when you go in that you're going to help these other people impede the official proceeding. So just you could have a situation conceptually in which somebody goes into a restricted area, but they don't intend to disrupt the proceeding that's going on in the area. Right. I mean, you could have somebody who just wants to come in and observe, even though it's restricted, they want to come in and observe and they want to take a picture to show that they were there, but they don't want to actually disrupt it. I agree that that's conceptually possible, but here you have a lot of different evidence, including communications from the defendants, like just taking over the Capitol. That was a text from Mr. Price. We just stormed the Capitol. That's a text from Ms. Ballinger. These things strongly suggest. Doesn't that suggest they were joking since they were just walking into the Capitol without, I mean, doesn't it? That's one conceivable inference, but again, we're entitled to the more favorable inferences, which they were not joking. They understood that they had joined a mob to take over the Capitol with the specific intent of disrupting what was going on inside the Capitol. That's the more favorable inference to the government from, we just stormed the Capitol. And of course, the defense. And the district court did make those findings. And the district court did make those findings correct, discrediting Ms. Ballinger's testimony that she was joking when she said, we stormed the Capitol. And I would also point to a text message exchange from before they walked to the Capitol, where Ms. Ballinger texted a friend, there was a breach at the Capitol. I would have been there, except that we had to stop so I could use the bathroom. Again, that shows this isn't just walking in as a They understand that the Capitol is closed. There's been a breach. She wanted to be there and wasn't, and then they go right over there to help the mob occupy the Capitol so that Congress can't continue the certification proceedings. Well, but based on their behavior, there was, you know, arguably an intent to enter a restricted building, the Capitol. But based on their behavior, where's the intent to So, so maybe there were other people there who were intending to disrupt the official proceedings, but, but the prices walked in and walked out. Right. But I think when you put together knowledge that the certification is going on and knowledge that the area is restricted because of the certification with going in to take over the Capitol to storm the Capitol, when you put those together, you have an intent to disrupt the certification by occupying the Capitol. And I would like again to return to this idea of whether there was knowledge as opposed to whether there was a restricted area because there were a lot of elements showing knowledge of the certification and the fact that there was a restricted area, as your honor pointed out, maybe one or two of these elements alone would not have been sufficient. And the district court acknowledged that as well and said, when the entered the restricted area at the very beginning at the perimeter, it's conceivable that they didn't understand yet they were in a restricted area. By the time they're entering the Capitol, they can see people trying to break in to the Capitol through the windows, clearly disruptive conduct, and their choice is to go into the Capitol where people have been breaking through the windows. There's glass on the floor. There's a blaring alarm. Joining those people who have set off the alarm is virtually to increase the disruptive conduct and the disruptive effect of this mob on certification proceedings. And I would also like to point out that the intent here and the conduct here is to disrupt or impede. And we think that impede does some work here because you can impede a proceeding before it's even begun. And certainly you can impede a proceeding while it's been suspended by preventing it from restarting within a reasonable period of time. The they were in the building. Every person in the building was a person that the Capitol Police had to clear out of the building. And that's in the record. There's testimony from the Capitol Police captain saying even one unauthorized person in the building was impeding Congress from restarting the certification proceedings. Your view of it is as if there were, you know, a bulletin sent out in advance that said, look, we want to, on the part of the people who come to the Capitol and want to disrupt the proceeding, let's assume there's at least some. And they sent out a bulletin. They say, we want to impede this proceeding. We want to at least stop it for a little while. The more people that we get to show up and go in the Capitol, the more likely it is that we're actually going to be successful in impeding the proceeding. And so therefore everybody who signs up and signs onto that cause is part of that effort to impede the proceeding. Right now, of course, there's no evidence that these defendants saw bulletin, but I'm just, I'm saying that's the effective. That's exactly the effect of that is what you was going on, that the effect of seeing this and knowing that, you know, it wasn't like the Capitol was open to tourists. There was a breach of the Capitol. That's Ms. Ballinger's own text. And so she understands that people do want to disrupt the proceeding and that therefore the more people who go into the Capitol, the greater that disruption is going to be. And the longer it's going to take to disperse it and the longer it's going to take to disperse all the people. With respect to the other issues. Well, I think with Alford, I do want to point out that this court in Alford explicitly acknowledged that Alford's conduct alone, like the defendant's conduct in this case would not necessarily have been disruptive. So there's no distinction there between Alford in this case, but that case was about whether there was knowingly disruptive conduct, but it wasn't about intent. And I went back and looked at the briefing. Alford didn't argue the intent wrong separately, the way the prices have in this case. Your Honor, I guess I don't see a strong distinction between knowing that your conduct is going to disrupt and then intentionally engaging in that disruptive conduct as opposed to a separate intent to disrupt. I would think that if you're knowingly engaging in conduct, you know that that is going to be disruptive. That event is an intent to disrupt. I'm not sure I see a strong distinction there. Well, I mean, there seemed to be like under 1752A, you have to knowingly and with intent to impede or disrupt the orderly conduct of government business or official function, engage in disorderly or disruptive conduct. So Alford seems to go to the element that they engaged in disorderly or disruptive conduct simply by being part of the people who entered the Capitol on January 6th. But the statute seems to have, and this was the first question I asked you, whether there's a separate element of an intent to impede or disrupt the orderly conduct of government business. Right. So I think knowingly in that statute is doing several pieces of work because you also have to have knowledge that it's a restricted area. But I think if you, again, if you know that you're engaging in disruptive conduct and you engage in that disruptive conduct, I think that also covers the intent to disrupt. I'm not sure when there would be a separate, when you would be intentionally engaging in disruptive conduct without having... Well, you could be engaging in disruptive conduct without an intent to impede official proceedings. Or at least that seems to be how the Congress wrote this statute. And you agreed that it was a separate element of the crime, which the government has the burden to demonstrate beyond a reasonable doubt. Yes. I guess I would say then that the evidence here, almost all the evidence of knowingly also goes to an intent to disrupt. When you know that there's a certification and you're walking in, it's hard to understand that differently than joining a mob that you know generally has the intent to disrupt. So you're augmenting not just the physical conduct, but also the intended result from that mob's actions. My colleagues, I have additional questions for you. Thank you. We would ask the clerk to affirm the judgment. Thank you, Mr. Hill. Mr. Kekiramath will give you the two minutes you asked for, for rebuttal. Thank you, Your Honor. The police officers spent not one second on the prices. Immediately upon being told, don't go further, the prices get in line to exit. And this argument of mere presence and burden, it has to be shown beyond a reasonable doubt that this is disruptive, whether it's on disruptive conduct or any other principle. And so the mens reas issues related, there's really no evidence that they knew the state of the proceeding. We're basically making a very fundamental argument here, which is when you see a bunch of police officers right there at the door, you are assuming they're going to tell you what to do and that the notion that you're going to do something kind of in their face to make it hard really needs to be borne out in some way. And there's just no evidence of this. This is all on video. And so all of these other statements, the one other point I would make, and this goes to the Fourth Amendment search warrant issue, I want to make sure that it's clear to people that the scope of the search warrant exclusion has to be based on the violation. The judge below simply claimed that the only issue was a single question. That's not the case. The case proved that the government ignored the central predicate in the search warrant formulation, which is there must be a filtering process. They ignored the filtering process. They included as evidence 14,637 pages of Facebook message. So they violated the search warrant. There wasn't any defense counsel didn't object to the Well, that we did, but on certain things, but not the specific inclusion. But that's a procedural point that is not relevant to the scope of the exclusionary rule. The scope of the exclusionary rule is based on the violation of the Fourth Amendment, which in this case is not a specific application. In the case, it is that they didn't run the filtering test at all. It's like there's a warrantless search. And so it's the full scope and the scope in the we've pointed out on a certain page of the brief, the number of places where Facebook evidence, all of these statements, all of these things we're talking about were relevant. So the case should be vacated on that ground as well. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan; Rao; Ginsburg